FLYNN ET AL., APPELLANTS, v. POINDEXTER & ORR
LIVESTOCK CO. ET AL., RESPONDENTS.

(No. 4,766.)

(Submitted April 19, 1922.    Decided May 15, 1922.)

[207 Pac. 341.]

*Livestock—Destruction of Grain in Inclosure—Driving from Public Range — Evidence — Insufficiency — Nonsuit — Negligence—Proximate Cause of Injury.*

Trial—Nonsuit—*Prima Facie* Case—Question of Law.
   1.   Under Revised Codes of 1921, section 9317, providing for a dismissal or nonsuit for failure of proof, whether there is substantial evidence in support of plaintiff's case is always a question of law for the court.

Same—Nonsuit—Competent Evidence Necessary to Defeat Motion.
   2.   While, on motion for a nonsuit, every fact is deemed proved which the evidence tends to establish and must be viewed in the light most favorable to plaintiff, yet competent evidence must be produced by him of all facts necessary to a recovery upon which the jury can base a reasonably reliable conclusion, and nothing can be left to mere conjecture.

Livestock—Destruction of Grain in Inclosure—Negligence—Evidence—Insufficiency—Nonsuit Proper.
   3.   In an action for damages for the destruction of grain in shock by plaintiff's cattle alleged to have been driven by defendants from the public range toward lands under fence owned by him and left there in a hungry condition, causing the cattle to break down the inclosure and do the damage complained of, evidence of plaintiff reviewed and *held* not to have made out a *prima facie* case sufficient to show that the moving of the cattle by defendants was the proximate cause of the injury, and that therefore nonsuit was properly granted.

Negligence—When Actionable—Causal Connection Between Injury and Negligence must be Shown.
   4.   Before negligence may be said to be actionable there must be such a causal connection between the negligence complained of and the injury suffered as to show that the negligence was the proximate cause of the injury, unbroken by any other intervening efficient cause, so that but for the act of defendant it would not have occurred.

Same—Willful and Negligent Tort—Measure of Liability.
   5.   While there is no essential difference between the measure of liability for a willful or wanton and a negligent tort, the injury in both instances must be a natural and direct result of defendant's act before he can be made answerable therefor in damages.

*Appeal from District Court, Beaverhead County; Wm. A. Clark, Judge.*

ACTION by Thomas Flynn and another against the Poindexter & Orr Livestock Company and another. From a judgment of nonsuit, plaintiff appeals. Affirmed.

*Messrs. Walsh, Nolan & Scallon,* for Appellants, submitted a brief; *Mr. C. B. Nolan* argued the cause orally.

In driving the cattle as they were driven, a trespass was committed by defendants and his trespass did not abate when the cattle were driven into the pasture of the plaintiff Flynn; in the pasture the trespass was a continuing one. The wrongful dominion over the cattle continued while the cattle were in the pasture just as effectively as when Mr. Orr and those assisting him were physically in their possession directing their movements. The cattle were not turned over to Mr. Flynn at any time by the defendants. The turning of the cattle into Flynn's pasture without his knowledge and with no notification that this had been done did not relieve the defendants from liability for the injury that resulted from bringing the cattle to the ranch. (3 Corpus Juris, p. 132, sec. 402.)

Is the damage complained of the proximate result of the wrongful acts of the defendant? On this proposition we cite: *Mize* v. *Rocky Mountain Bell Tel. Co.,* 38 Mont. 521, 129 Am. St. Rep. 659, 16 Ann. Cas. 1189, 100 Pac. 971; *Brisch* v. *Citizens' Electric Co.,* 36 Mont. 574, 93 Pac. 940; *Lundeen* v. *Livingston Electric Light Co.,* 17 Mont. 32, 41 Pac. 995. At best, in the light of the circumstances, it was a question for the jury to say whether the damage done was a proximate result of the handling of the cattle by the defendants. (*A. M. Holter Hardware Co.* v. *Western Mtg. etc. Co.,* 51 Mont. 94, L. R. A. 1915F, 835, 149 Pac. 489; *Messa City* v. *Leseur,* 21 Ariz. 532, 190 Pac. 573.)

*Messrs. Lew. L. & E. J. Callaway,* for Respondents, submitted a brief; *Mr. Lew. L. Callaway* argued the cause orally.

While the abstract rule voiced by appellants, for which they cite *Morelli* v. *Twohy Bros. Co.,* 54 Mont. 366, 170 Pac.

757, to the effect that on a motion for nonsuit the evidence of the plaintiff is to be regarded as proving every material fact which it tends to prove, is conceded, yet it is submitted that there are two well-established limitations to this principle which make it inapplicable in the instant case: First, there must be substantial evidence in order to justify the submission of a case to a jury; second, where the case is submitted upon the plaintiffs' evidence the rule does not apply.

This court in *Escallier* v. *Great Northern Ry. Co.,* 46 Mont. 238, Ann. Cas. 1914B, 468, 127 Pac. 458, recognized and established the first limitation. (See, also, *Samulski* v. *Menasha Paper Co.,* 147 Wis. 285, 133 N. W. 142; *Hercules Oil Refining Co.* v. *Hocknell,* 5 Cal. App. 702, 91 Pac. 341; *Vaughn* v. *Boston & M. R. R.,* 78 N. H. 615, 103 Atl. 129.)

The second limitation was recognized in the case of *Brophy* v. *Idaho Produce etc. Co.,* 31 Mont. 279, 293, 78 Pac. 493. Cognately see *McIntyre* v. *Northern Pac. Ry. Co.,* 56 Mont. 43, 50, 51, 180 Pac. 971, holding that the legal insufficiency to sustain a verdict may arise from the inherent weakness of the testimony itself.

The question whether or not the evidence tends to prove that negligence was the proximate cause of an injury is a question for the court. The following cases illustrate the application of this rule under various circumstances: *Smith* v. *Public Service Corp.,* 78 N. J. L. 478, 20 Ann. Cas. 151, 75 Atl. 937; *Jenkins* v. *La Salle etc. Coal Co.,* 264 Ill. 238, 106 N. E. 186; *Eagle Pass Lumber Co.* v. *Galveston H. & S. A. Ry. Co.* (Tex. Civ. App.), 164 S. W. 402; *Allison* v. *Fredericksburg,* 112 Va. 243, 71 S. E. 525; *Jennings* v. *Davis,* 187 Fed. 703, 109 C. C. A. 451; *Stone* v. *Boston & A. R. Co.,* 171 Mass. 536, 41 L. R. A. 794, 51 N. E. 1; *Tolin* v. *Terrell,* 133 Ky. 210, 117 S. W. 290.

The test of liability for the trespass of cattle is care and control, and the general rule is that he who has the care and control of them is liable. (*Smith* v. *Jacques,* 6 Conn. 530; *Rossell* v. *Cottom,* 31 Pa. St. 525; *Noyes* v. *Colby,* 30 N. H.

143.)    So the owner of animals having care and control of them is liable even though the cattle are driven from his close and toward the plaintiff's close by a stranger without his authority, where after they are left to themselves in the vicinity of plaintiff's close they wander there and commit a trespass.    (*Noyes* v. *Colby,* 30 N. H. 143.)

MR. JUSTICE GALEN delivered the opinion of the court.

This is an action to recover $2,100, alleged damages for the injury and destruction of certain grain in shock, belonging to plaintiffs, on their land, by reason of a large number of cattle breaking into plaintiffs' inclosed grain field, feeding and tramping upon such crops.

It appears that the plaintiff Rutledge leased from his coplaintiff certain lands in the valley of the Blacktail Deer Creek, Beaverhead county, Montana, which were inclosed by fence, 150 acres of which were planted in oats; that such grain crop grown thereon had, on the dates complained of, November 3 to 5, 1918, been harvested and shocked; and that the crop was owned jointly by the plaintiffs. The defendant corporation also owned lands in this valley, and was at the time engaged in the business of raising cattle, horses and sheep; the plaintiff Flynn conducting like business. About twelve miles from the lands owned by the plaintiff Flynn and contiguous to lands owned by the defendant company, there was a body of unsurveyed public domain, open for the use of the public in stock grazing; and that on the third day of November, 1918, there were grazing thereon cattle in large number belonging to the plaintiff Flynn, to the defendant company, and to other residents of Blacktail Deer Creek Valley. Bert Orr was employed by the defendant company and was one of its directors and its manager, and on the date mentioned it is alleged that the defendants, being desirous of excluding from such public domain cattle other than those belonging to the defendant company, drove off the range, where they were pasturing, such cattle to the number

of about 1,200 head, the property of the plaintiff Flynn and others, against the will of the owners and without their consent, and over protest, and moved them a distance of fifteen miles along the public highway without feed or pasture, during the prevalence of a snowstorm, leaving them in a hungry condition on a portion of the plaintiff Flynn's land, adjacent to the field where the grain harvested and shocked was injured and destroyed by them. It is alleged that the defendant knew, or in the exercise of reasonable care should have known, that the cattle, left in the hungry condition in which they were, would break into the field of grain belonging to plaintiffs; that they were by the defendant so left without advice to the plaintiff as to their presence; and that, on the night of the 4th of November and the morning of the 5th, they broke into the inclosure containing the grain, and ate up and destroyed about thirty-five acres of grain.

By answer filed, the defendants admitted the corporate existence of the defendant company; that the defendant Bert Orr was in its employ and at the time was its manager and a member of its board of directors. Further it is admitted that the plaintiff Flynn and the defendant company were the owners of large numbers of cattle; that the plaintiff Flynn owned lands adjacent to the lands of the defendant company; and that contiguous to some of the lands owned by the defendant company "there is a body of unsurveyed public land open to the public without pay for grazing stock." All other allegations of plaintiffs' complaint are denied. By way of special defense it is alleged that, at the time stated in plaintiffs' complaint, the plaintiff Flynn and one Pat Laden were holding, in charge of their herders and employees, about 1,200 head of cattle in the valley of the Blacktail Deer Creek, and attempting to pasture them upon about 300 acres of public domain, which was wholly insufficient; that they were so carelessly and negligently herded that they were permitted to break through the fences inclosing the lands of the defendant company, to overrun the same, and feed off the grass grow-

ing thereon; that the defendants demanded of the plaintiff Flynn that he take care of such cattle and prevent trespass by them on lands belonging to the defendant company, which the plaintiff Flynn failed, neglected, and refused to do.

It is then alleged by defendants, by way of "full and complete defense": "That being otherwise unable to protect the fences and lands of the defendant company from the encroachments of said cattle, these defendants, as they had a right to do, gathered up said cattle so being in the charge of said plaintiff and those acting in conjunction with him, and drove the same down the county road through the valley of Blacktail Deer Creek, a distance of some ten miles, and left the same near the premises of the said plaintiff Flynn, and in the vicinity of the premises of said Laden. That the said plaintiff Flynn was present at the time said cattle were started from the lands of the defendant company, and well knew that the same were driven to and adjacent to his own premises in said valley, and that said cattle required the care and attention of their said owners, but knowing such facts said plaintiff Flynn made no effort whatever to care for the said cattle and made no effort to protect his own inclosures or the fences inclosing the lands of his coplaintiff Rutledge."

Issue was joined by plaintiffs' reply, wherein it is admitted that the plaintiff Flynn and Pat Laden were herding cattle on the public domain; that the cattle were being driven by defendants along the county road and were left near the premises of the plaintiff Flynn in a hungry condition. By way of further reply, plaintiffs deny that the fences of the defendant company were broken down by the cattle belonging to the plaintiff Flynn and his associates; that the public lands contiguous to defendants' lands embrace only 300 acres, and in this connection allege that such lands comprise several thousand acres. The allegations quoted above, set forth in defendants' answer as paragraphs IV and V, plead by way of full and complete defense, to the effect that the

cattle were by the defendants driven down the county road a distance of about ten miles and left in the vicinity of the premises belonging to the plaintiff Flynn, are admitted.

The case was tried to a jury, and at the conclusion of plaintiffs' case the defendants moved the court for a nonsuit, which was granted, and judgment thereupon entered for the defendants with their costs. The appeal is from the judgment.

But one question is presented decisive of the case, *viz.:* Did the court err in granting a nonsuit?

Thomas Flynn, one of the plaintiffs, testified on direct examination in part as follows: "I live on Blacktail Deer Creek, in Beaverhead county, Montana, about seven miles south from Dillon. I have lived there over forty years. My place is on both sides of Blacktail Deer Creek. Blacktail Deer Creek runs through about near the center of Blacktail Deer Creek Valley where I live; I join fences with the Poindexter & Orr Company for about two and one-half or three miles. Blacktail Valley runs for forty miles from Dillon up and down. It is not very thickly settled. It is settled pretty well down close to town; Poindexter & Orr Livestock Company owns it for about eighteen or twenty miles of the creek on both sides. On the west side of the creek up until a few years ago since they took up dry farming, the Poindexter & Orr Livestock Company's possessions would not extend a mile on the west side of the creek any place. I range my cattle—Laden's and mine—on Blacktail on both sides of the creek. In late years Ernest Selway put a fence above so the cattle can't get across, but some gets across. There is some on both sides of the creek. Q. The range on the east side of the creek is known as what range? A. It is known as the Blacktail and Sweetwater. Q. Is that the west side? A. The west or southwest side. Q. The range on the west side is known as what? A. It would be the Blacktail and Sage Creek. Q. How extensive is that range on the west side? How far does it extend? A. From the mouth of the canyon

—the last place taken up—over to Sage Creek, there is a strip of government land not less than six or seven miles wide. Q. In length what would it be? A. You could start in and go to the Centennial Valley on government land without being fenced in in any place for forty miles. * * *

"In 1918, I was engaged in farming, cattle-raising and horse-raising. Along about the 3d of November, 1918, my cattle on the southwest side of Blacktail Deer Creek was ranging from Jake Canyon up to Cottonwood and in the hills back towards the top of the range to Sage Creek. At that time there were cattle on that range belonging to Pat Laden, and to Mr. Keenan, and to Orr & Poindexter. About the 3d of November, 1918, there must have been all of 700 head of my cattle on this range. Some of these cattle were on that range all summer. As they kept coming in, I drove a lot of them up and put them on the public range. Some of them come back down as far as the Poindexter & Orr ranch, and Mr. Orr and two of his men took them and put them out on Smallhorn Canyon. I went after them and asked them what they did with the cattle, and Mr. Orr told me he put them out on Smallhorn Canyon, and that if they come there at any time in the future he would do the same thing with them. So I went after the cattle and rounded them up and took them back to my ranch, and then I took them up again on the range, and I hired a man by the name of Cozad to herd them back on the range and not let them come down. I had been herding these cattle up there, I guess, about a month before the 3d of November, 1918. It must have been nearly a month before the 3d of November that I had this talk with Bert Orr that I have told about. He said that the cattle were in his alfalfa. Along the road his fence was down, and he had his gates open there on the place, none of them were closed, and the cattle that come down the road could walk right in there; there was no fence to keep them out, or anything else; they never closed their fence or gates while haying that fall; and I put a man to herd them so that they would not come

down on the place. We talked it over several times that fall before November 3, and I told him that I would not have them damaging him; that I would keep them up on the range and not let them come back down. I kept a herder there until the 3d of November. I had this man Cozad for a while, but he quit the job; and when he quit I went there myself and a man of Pat Laden's. Before the 3d of November, I should judge I had been there about ten days; I did not keep track of the time, but I should judge about ten days.

"Q. What, if anything, took place on the 3d of November in reference to these cattle? A. I went on up the road on the 3d of November in the afternoon after dinner, on horseback, and I met Mr. Bert Orr and five other of his men with the bunch, probably 1,200 head of cattle, in the mouth of the lane. They had them all rounded up. It is a lane of Orr & Poindexter's between the two places. He was on the open range just getting into it [the lane] when I asked him that he give me my cattle and I would take charge of them. At the time I found these cattle as I have told you, they were right within half a mile of the public range; they were right on the public highway that runs up and down the valley; he had them on the public highway. I told him that I would take charge of the cattle that were mine, I did not want him driving them, and he told me to step aside; and I got right in front of the cattle and kept them back in the lane, and he told me the second time to step aside; and I rode ahead of the cattle until they come out of the lane off his land, and as soon as they come out of his land on to the dry farmer's property I demanded them again. I made another demand, and he made the same statement. He gave me the same order, to step aside. He had a gun on the saddle, and I thought the better thing to do was to step aside. There was five men with him and himself. Mr. Orr seemed to be directing the movements of the men there. It would be about twelve miles from my home place to where these cattle were

thus driven or being held. This was on Sunday. When I had this conference with Mr. Orr, it was somewhere between 1 and 3 o'clock. The cattle were only just rounded up when I first met Mr. Orr; he had them just rounded up when I met him. Before that, when I last saw the cattle, they were grazing on what I considered to be the public range, on probably four miles by two or three miles. In the talk I had with the defendant Orr on Sunday afternoon he did not tell me what he was going to do with the cattle; he told me to step aside. Then later in the evening he had the cattle rounded up when I come down the road in front of his place below Landon's, about three hours after, and I went again and made a demand on him for the price of the cattle in the presence of Pat Laden. I came down the road in the direction of my home ranch, and about four miles beyond where I last talked with him I met him again. The cattle were driven about four miles; he had them rounded up at this time, and I made a demand on him for the price of the cattle since he would not turn them over to me.

"On Monday morning the cattle was up in front of Orr & Poindexter's home ranch. I did not go up to see them there. I went up the road a little ways in my car, and I seen they were there; I supposed they were there. They were in there on the road where the men was working them, and I took my car and went to town and went over to Helena for to find out what remedy I had at law. That was the last I seen of the cattle. Where I saw the cattle up there at Poindexter & Orr's place, it would be two miles from where my fence was opened and the cattle run in, exactly. The cattle were being held stationary at the time I seen them on Monday. There. was not a bit of feed for the cattle on the highway from the time I saw them on Sunday until Monday. It was a public road. In 1918 I did not have any crop in on my land myself; I had it leased. Patrick Rutledge and Ray Tash were the lessees. Patrick Rutledge had quite a lot of grain in; he had in somewhere about 150 acres. This grain-field was inclosed by

a fence, part of it with a two-pole jack fence, and part of it with a three-pole jack fence and two wires. When I went to Helena on Monday, the grain in that field was all stacked, but this thirty-seven or forty acres, that was in shock. We allege no damage for the stacked grain, but just for the shocked grain, that was a total loss. Rutledge was to do all the raising and cutting and stacking of the grain, and we was equal partners in the results of the crop. I returned to my place from Helena on the following Sunday. When I returned this grain was a total loss. Every acre of the thirty-seven acres was a total loss; that that was not in the stack was not worth the stacking, and the straw itself was not worth gathering up, what was left of it. There was only a remnant of it left.''

On cross-examination, he testified, in part: ''I don't know that my fences were down at the home place. The fence was open and torn down. I did not tell the jury that they were down. There was a gate there, and they could go down to the gate. The fences were torn down by the people who drove the cattle in there. The fences was up prior to that morning when I left. That morning the fence at that corner was not down. I went by it that Monday morning, and the fence was up, and when I come back the main fence was down. There was a couple of panels of the fence down. That is not the place where I used to have bars. When I left for Helena, this fence at the corner was up. It was a three-pole jack fence. I said the following Sunday morning the fence was down; I said that was the last I seen of it until the following Sunday morning. The fence was not down at that corner that morning where the cattle was put in, but it was down when I came back. There was places in the fence along my place when I saw it the last time before going to Helena that was not the best in the world, that is, of the pasture fence. There was places in that fence that they could drive cattle in if they wanted to drive them in. The first dozen panels of the fence along the road was up, from that

corner. For that distance it was a two-pole jack fence and a rider; it is. what I consider three poles. It is a pasture inside of that field. It runs down to my house. The cattle could get down to the house, but they could not get out to the main pasture until they broke the fence. There was not a pair of bars where they broke the fence. There was a place we used to go in at that corner to the creek where we made bars of the jack fence. Between the pasture and the grain-field there was a three-pole jack fence and two wires; it was a four-pole jack fence with one wire; I believe. It was the average height of a jack fence. I did not measure it. It was high enough so that the cattle would not jump over it. It still turns cattle. It is right there and turns cattle yet. It was not five feet high. It was just a regular four-pole fence, the same size as any other jack fence. I can't give you the height in inches. The other fence was three poles and two wires. That is turning cattle yet. The fence I am now describing is the fence between the pasture and this grain field that was down. I first saw these cattle in charge of Mr. Orr at the mouth of the lane, between where Ernest Orr and Matt Orr's field is fenced above the road. I should judge that was about two and a half miles from the Cozad ranch, south. They must have had 1,200 head of cattle in the bunch. Mr. Orr and I had no talk, only I demanded the cattle, I said, 'I will take care of them.'

"Q. Didn't he tell you at that time that he was taking these cattle because you were herding them on his leased lands, and that they were always breaking through the fence, and you were not stopping it? Answer yes or no. A. No. Q. And didn't you ask him where he was going to take these cattle, and didn't he tell you that he was going to take them down home to your place? A. He told me he did not care if they went to hell, if you want to know what he told me. He did not say that he was taking these cattle down to my place. He told me to step to one side; that he would take charge of the cattle; that is what he said. That

he had the cattle in charge ·and to step one side. You bet your life I stepped to one side. I did not fly very far down the country after that. He told me several times in the lane to step to one side. After that I went away from there— when he would not give them to me. After he got them off his land, I made a demand that he give me my cattle, and there was not any use for me to stand in front of a gun. This time when I made the demand the cattle were on his land coming through that lane, all the way through for two miles. I waited until I got off of what he could consider his land and made another demand. They were not on the public road; they were on two dry ranchers' places. There was no road there; it was not fenced. When I came back with Pat Laden, these cattle were down at what we call the old Daly field of the company. I should judge that was about seven or eight miles from the home place. They had driven the cattle a distance of five miles. There was not quite as many as 250 head in Pat Laden's bunch; there was fifty or seventy-five head.

"Q. You just simply came and delivered this extra number of cattle, whatever there were, over to these people, didn't you? A. We could not do anything else, but drive them right in there; we could not get by. I knew they had possession of the cattle the last time I seen them driving them down the country. Notwithstanding that, I joined Mr. Laden in taking this other bunch of cattle along until we met this bunch coming down. I went back to make another demand, to see if I could get my cattle and take them with me. At that time I told him I turned the cattle over to him at $90 a head. I would not say what price Mr. Laden demanded for his cattle; I won't say how much he demanded, but I told him $90 was my price. Mr. Orr told us that the cattle and us could go ·to hell, if you want to know what he said, when he was through with them, but he was not through with them yet. I will swear positively on oath that I did not know that the cattle on Sunday night, on the 3d of November, were

put in the company field at the home place and fed there and stayed there all night. I don't know what become of the cattle after I left that night until the next morning. The next morning I seen the cattle on the road somewhere about noon or the forenoon; I won't say exactly what time it was. I saw them in front of the house and the stables. I did not get close enough to make any estimates at all of the number of cattle that were there at that time; I would not get within range of the rifle any more. I was afraid, I will admit it. There was not any cattle in that vicinity only the bunch they were driving, and I come to the conclusion, from that, that they were mine. I don't know anything about the condition of the cattle that morning. It was starting to snow when I left home; it was snowing in Helena the next morning good and strong. It was not storming Monday morning at daylight, but it was storming at noon when I left home. There was a windstorm raging Sunday night all night, but there was no snow; it snowed from Monday noon until Tuesday night, I guess, and Wednesday. I left for Helena on the 2 o'clock train.''

Patrick Laden testified, in part, on direct examination: ''I am related to Tom Flynn, one of the plaintiffs. I have lived in Beaverhead county about twenty-six years. My business has been farming, raising some cattle and a few head of horses. In connection with the alleged injury to some grain belonging to Mr. Rutledge and Mr. Flynn in 1918, I had something to do with cattle then. I owned some cattle in November, 1918. I owned in the neighborhood of 300 or 350 head, maybe more. I kept the cattle up on the range at the head of Blacktail during the summer months until the cattle were brought in in the fall. During the first part of November, 1918, these cattle were on the range. In order to keep them on the range, we were driving them up and keeping them up in the hills. By 'we' I have reference to the man I had there helping Mr. Flynn; I did not stay up there. On November 3, 1918, I was taking up some cattle up to the

range. These cattle kept coming down from the hills. I saw Bert Orr on that day on the county road, I think seven or eight miles up the road from Tom Flynn's place; I could not say how far it was. I could not say exactly how many cattle I was taking up to place on the public range at that time, but maybe seventy or eighty head. In going up there I met Mr. Flynn. I was going up with the cattle, and he was coming on down towards home. I kept going on up. Mr. Flynn did not keep on going down; he come back with me. In going on up I saw the defendant Bert Orr, and as near as I know he and four or five men he had with him, I could not say which, had a bunch of cattle all rounded up in the center of the road, and he was cutting out cattle out of the bunch. It was a big bunch of cattle. There would be about 1,000 or 1,100 head. There was cattle belonging to me in that bunch; that is, cattle other than the cattle I was driving up there. The cattle I was driving up there went into the bunch in the middle of the road. I could not go on with the bunch I was driving because that whole big bunch was in front of me and I could not get through the bunch. There should be close to 300 head of my cattle in that bunch, without adding the bunch I was taking up. This bunch of 1,000 cattle belonged to different parties. At the time I encountered these cattle, they were standing still. They were bunched up, and the men was holding them in the road. Bert Orr was doing the cutting out; he cut out some cattle out of the bunch. Mr. Flynn did not have any conversation with Mr. Orr in my presence; I did not hear him have any at that time. I went over to Mr. Orr and asked him what he was doing with the cattle, and he said, 'I am going to get mine out of here, and turn them to hell down the road.' I said, 'You have my cattle in your possession,' and I said, 'You better take care of them.' He laughed and went on cutting out and kept a going. That is all the conversation I had with him that I remember. I believe I told him that I could have sold them cattle last spring for seventy dollars a head, and that he had

better take care of them; that he had them now in his possession. The sixty or seventy head I was driving up got into that bunch. When I left there that afternoon I did not bring any of the cattle with me.

"The next time I saw these cattle was the next day, Monday. I saw them on the road about half a mile back of the company ranch, back of the Poindexter & Orr ranch. I think that would be about two and a half miles or three miles from this pasture that they finally got into next to this grain-field. At that time when they were on the road there there was four or five men around the bunch; they were rounding them up in a bunch on the road. I saw them there in the forenoon, probably between 9 and 10 o'clock, around that time. At that time I was going up in the hills. I was in the company's field. I next saw that bunch of cattle in the afternoon of that day, between 1 and 2 o'clock; it was after dinner. At that time the cattle were in Mr. Flynn's field. I don't know how they got in there. The fence was up that morning as I passed by the road. When I saw the cattle in the pasture, the fence was down at the corner where the roads cross each other; there was about two panels of the fence down. I have no personal knowledge as to how it came to be down. There were in the pasture about the same amount of cattle that was in the bunch, I would think from the looks of it. It started to rain a little bit about noon, and about 1 o'clock it started in to snow after that, later in the evening; it was a soft snow. It was a small field for a summer pasture along the road where the cattle went in; there was better than 100 acres in it. There was an oat crop being raised on some land close to where that pasture was. There was a fence between that oat-field and that pasture. At the time I saw these cattle in the pasture I did not do anything that Monday afternoon; I went home. I next saw these cattle Tuesday morning right close to Mr. Flynn's house, standing up around his granary and corrals he had there. I believe it snowed all night that night. Tuesday morning I did not notice the condition of

the oats in the oat-field. Wednesday morning I went over there after the election. I come to town Tuesday evening here. It was election day, and I went back over there Wednesday morning, and I found that some of the cattle was in the oats, and some of them were breaking in, going through the fence when I got over there. I tried to drive them out. Pat Rutledge came up and helped me, and he had a man, but the man was afoot; he had no horse; and Mrs. Flynn was out there afoot, and there was the little boy, Mrs. Heavy's boy; he was out there. That was on Wednesday morning. There was about 200 or 300 head in there when we started to put them out. We did not put them out because we could not. I kept at it until half-past 5 or 6 o'clock that evening, me and Pat Rutledge and his man and Mrs. Flynn and the boy. The first time I noticed these cattle in the grain was Wednesday morning, and at that time there was about 200 head in the grain. They went through the fence into the grain-field. Pat Rutledge was trying to drive them out when I first noticed them in the grain-field. That morning he was the only one that was there. We kept trying to get them out of there until Wednesday evening.

"In the meantime during that day Pat Rutledge's man came to engage in the work of getting them out, but he was afoot; he had no horse; and Mrs. Flynn and Vincent Heavy, the boy that was stopping there, came also. We could not do a thing with them. While we were trying to drive them back, they got worse. They were coming down through the crop, and they were making better headway than we was. They were increasing right along until the whole bunch got in the grain. By Wednesday evening all that was in that bunch was in the grain, about 1,000 or 1,100 head. We worked at them until 6 o'clock that evening. I had three dogs and my saddle-horse, and I was tired, and I went home. I had supper and got the man, and the two of us come back that evening, and I got a fresh horse. When we got back, Rutledge was in the field. We heard

the dogs barking, and we went over to him, and we worked there, the three of us, until 12 o'clock at night. We finally succeeded in getting the cattle out the next day, Thursday. We could not do a thing with them all Wednesday night, and at 12 o'clock we made up our minds to leave them; we could not do a thing with them under any consideration. We did not have any trouble at all on Thursday to get them out; we just got them in the lower end of the field, and drove them to Flynn's corral. The reason we were able to drive them so easily on Thursday was they seemed to be filled up, and then we could drive them; that is my notion about it. The range where these cattle were herded was all the way from a mile, I would think, to a mile and a half from the county road. After you get up a mile from the county road I did not see any fences. There is a fence along the county road.''

On cross-examination he testified: ''November 3 was Sunday. I saw Tom Flynn on the county road the first time that day, right above the company ranch, between the company ranch and Frank Landon's. Mr. Flynn was traveling towards home. I was driving up some cattle. I had gotten some of these cattle in Flynn's field and the rest of them on the road, on the road below the company lands. I was taking the cattle up the country. After I met Mr. Flynn, I drove these cattle probably a mile or a mile and a half before I met Mr. Orr with this other bunch. These cattle at that time were about three or three and a half miles, I would think, from the company ranch. When the two herds of cattle were joined, Mr. Flynn did not do anything. We did not stay there. I went in to see Mr. Bert Orr; he was in the herd. I wanted to see what he was going to do about the cattle. He told me that when he got through cutting his out he would turn them to hell down the road; and that is the time I told him he had my cattle, and he could take care of them at seventy dollars a head. Then I went home, and Mr. Flynn went with me, and Mr. Bobinack too. Mr.

Flynn stopped at his house, and I went home. Mr. Flynn did not tell me then to keep an eye on what was being done with the cattle; he told me that on Monday, I believe. I was riding for cattle is why I went up that way Monday morning; not for these cattle, but for any strays there was. I did not notice any cattle down by Mr. Flynn's at that time Monday morning. I did not see any cattle down there. I went into the Poindexter & Orr field. Mr. Flynn did not go with me that morning at all. After I saw Mr. Flynn there on Monday morning, I went alone up the country. Monday morning Mr. Flynn told me to see where the cattle was that was on the road above. That is what he told me at that time, to see where the cattle was. That is all I seen of Mr. Flynn for four or five days. I noticed some of these cattle on Monday afternoon in Flynn's field, but I don't know how they got there. I did not see anybody driving them Monday afternoon. There were none in there Monday morning when I passed by there on the road; there was no cattle in Flynn's field when I got back to Flynn's. I was home Monday evening. I next saw the cattle Tuesday morning. I went over to Flynn's, and I saw the cattle bunched· up around Flynn's corrals on the outside of the corrals, and around his granary and potato patch. He had a potato patch back of the granary, and they were standing around there. A little farther up into the dry field there was one fence between the cattle and the grain-field.

"Q. So they had to go through from the potato patch—they had to go through the opening in the fence, and then go through the lane up into the dry field, is that right? A. There was a short lane; yes, sir. At this opening there was a pair of bars. Q. If they had been up then, there would have been two fields to go through before they could get to the grain-field? A. There was two fences to go through. On Tuesday morning there was just a fence to the left of where the cattle was. The grain was probably a mile from Mr. Flynn's house, maybe more; it might be a mile down in

the lower end of the field where the grain was. The cattle did not have to go by Mr. Flynn's house in order to get down to the grain; they had to go out that lane into his dry field. We call it ten rods from Mr. Flynn's door of his house over to the land. It was in plain sight of the house. After the cattle got up in the dry field, you could see them from the house, if you were outside. I don't know what time on Tuesday the cattle got out of the pasture and the potato patch and around the granary, up into this dry field. I did not stay there long Tuesday morning until I went home. I seen that the cattle was around there standing up around the fences, or at the granary, and around there. I could not say whether the bars were up at that time or not. At that time I did not see that any of the cattle had gotten out into this short land. I went back home and went to town. That was Tuesday, election day. I got back to the Flynn place Wednesday morning, and there was a few head of the cattle in Flynn's field in the grain. There was six or eight head down in the oats. There was six or eight head in the oats Wednesday morning, and the rest of the bunch was above in the same field. I did not chase these six or eight head at that time. I don't know whether any grain had been eaten up at that time or not; I was not out to the grain at all at that time. When I got there, there was about 200 head of the bunch in the same field, picking around the edges. The grain that was shocked on the land was maybe a quarter of a mile away. I made an effort to chase these 200 head out, but I did not get them out. We got the cattle out Thursday morning; we got another man, and we got them all out. Thursday morning I called up John Laden when I went home, and he come over and helped us. We got them out easily Thursday morning. The four of us got them out. We put the cattle in Flynn's corrals. I cut mine out that day, and I had his cattle there and I put them in his field across the road. On Thursday we put the Flynn cattle across the lane into Flynn's field, on the other side of the road.

I put all of the Flynn cattle across the road, and I took mine home."

The plaintiff Patrick Rutledge testified on direct examination in part as follows: "In 1918, I had some of Mr. Flynn's land leased, and I had about 150 acres of that land in oats, besides some alfalfa I had to look after. This whole field of 150 acres of oats was fenced all around. I had a medium amount of a crop; I had what I call a fairly good crop. About the 4th or 5th of November, I had it all stacked, except around about forty acres, I should judge, and that was in shocks. I had just finished cutting it about five days before, and it was not ready to put in stack yet. Figuring up what I threshed and what I sold, it went something around sixty bushel to the acre. The whole field was the same crop; it was the same kind and class of grain in that field. It went forty pounds to the bushel; that is what I paid for threshing it; that is the way it is averaged. About that time other people sold oats for $2.85 a hundred. Q. When, if at all, did you first learn that there were any cattle in this field? A. Well, the evening of the 5th, election day, I came to town to vote, and when I got home that evening it was just getting along towards dark; it was not quite dark, but it was getting along there, and just as I got to the house Mrs. Flynn was there. She come down afoot; she come down. It was about 8 o'clock on Tuesday evening that I first learned of it. Upon learning that, I got my saddle-horse and went right out after them. There was a bunch of cattle coming down on this bench land above the grain, and I started working on them right there, and they kept getting more and more; they kept backing me up, and I worked with them until about half-past 10 o'clock on Tuesday evening and they got too much for me. I could not do anything with them alone. I got my horse pretty well run down, and I went back to the house. I had a hired man there, and he was in bed, so when I asked him if he would get up and help me he did. He come out with me. There was a saddle-horse there, but I did not have

any second saddle, and we changed off once in a while. When he got tired riding bareback, I would take it, and we worked there until half-past 4 in the morning. On Tuesday evening these cattle on the bench were inside of the grain inclosure. At that time there was no grain damaged. I should judge, according to the way it looked, from what I threshed of it and everything, that there was between thirty-five and forty acres still of the grain in shocks. I could not be exact about the amount. The grain-field runs up quite a ways in the upper end, but then on Tuesday evening, from where the shocks were the cattle may have been better than a quarter of a mile away from there. The grain-field runs along where the rest of it was stacked and joins this bench land; there is just an irrigating ditch between them. There was lots of snow on the ground on Tuesday evening. The cattle seemed to be hungry; they were hungry and bawling; they were bawling with hunger, I don't know what else it could be. The cattle were forcing ahead all the time. The whole bunch of cattle got to the grain about 6 o'clock Wednesday evening. I was riding right along all day Wednesday with the cattle. During this period of time, in trying to get these cattle out of the grain-field, I was assisted by Pat Laden. He was the first one that come there to help me, and him and I worked there from, I should judge, it was along about 8 o'clock on Wednesday morning when he come there, and he and I worked with them. We got them up a little ways until they saw where we were driving them, and then they started to break on us again. I think it was about 10 o'clock, or some place around there, on Thursday morning, when we succeeded in getting the cattle out of the grain. We did not have much trouble Thursday morning in getting them out. They were all lying down in a bunch when we got there, and they seemed to be satisfied, filled up. They ought to be; they ate forty acres of grain up. After we got the cattle out of the grain-field, this grain that was shocked I consider almost a total loss."

On cross-examination he testified: "It is about a mile from where I live to Tom Flynn's house. I can see Tom Flynn's house from mine, and he can see my house from his. I have known Tom Flynn's whole ranch for about eight years, I guess. All the land I had leased of Tom Flynn was entirely within his fences in November, 1918. The land I had leased of Tom Flynn at that time was all in one field by itself. I know where this potato patch is they have been talking about, above Tom Flynn's. I know where that lane sort of comes down from the potato patch, by his granary, and then out into that field; there is a lane right from his gate going into his house; there is a lane leading up into this wire field, they call it. There is a pair of bars there across this lane. When these bars are up, there are two fences between the potato patch and my field. Q. I will ask you if it is not a fact that, when the cattle first got into your grain, you drove those cattle out and put them all across the road? A. No, sir; I did not put them all across the road. The first bunch I drove I got them to what they call the little field. There is twenty acres, I believe that is what is in it. It was adjoining Mr. Michaelson's. So I put this bunch of cattle across there, and I could not get them in over there, and I just opened that gate and pushed them across the road into the other field and closed up the gates, and then they broke out of that field. I did that Tuesday night. I did not put these cattle across into the Michaelson field; I put them into the field that belongs to Tom Flynn. I took these cattle and put them into the Tom Flynn field that joins the Michaelson field on Tuesday night. I should judge there was a couple of hundred head of them. There was cattle in the grain-field after that. They were coming in from the other side all the time. They were coming in from this wire field; that is where they were coming from. I guess the cattle just jumped over the fence and broke it down. When I got back up close pretty well to the fence, I got a look at it, and it was broke down in three or four places. When these 200 head were put in Tom Flynn's field, there was two fences between them and

where the oats were. There was one on each side of the road. I put them across the road, and there was two fences between them and the grain. At the time these 200 head were put across there, there was not much damage done to the oats. It was on Tuesday night that I put these 200 head across into Tom Flynn's field. I did say that this other bunch of cattle did not get down to where the grain was until Wednesday night. There was no damage done until Wednesday night. I got this bunch headed off before they got to the grain, and I kept them above until I got them out in this gate across the road and put them in that field. Q. After you got these 200 head across there into Tom Flynn's field, which was on Tuesday night, there was no more trouble, no more grain damaged, until the following Wednesday night, was there? A. I held them all the time until then. I kept them out of the grain. I was riding right there in front of them and keeping them out.''

The foregoing synopsis constitutes the gist of all of the plaintiffs' testimony offered in support of their complaint.

Our statute, section 9317, Revised Codes of 1921, provides:
[1] ''An action may be dismissed or a judgment of nonsuit entered in the following cases: * * * (5) By the court, upon motion of defendant, when, upon the trial, the plaintiff fails to prove a sufficient case for the jury.''

Whether there is substantial evidence in support of plain-
[2] tiffs' case is always a question of law for the court. (*Brophy* v. *Idaho Produce & Provision Co.*, 31 Mont. 279, 78 Pac. 493; *Escallier* v. *Great Northern Ry. Co.*, 46 Mont. 238, Ann. Cas. 1914B, 468, 127 Pac. 458; *Lee* v. *Stockmen's Nat. Bank, ante*, p. 262, 207 Pac. 623.)

While, on motion for a nonsuit, every fact is deemed to be proved which the evidence tends to establish, and must be viewed in the light most favorable to the plaintiff (*Sprinkle* v. *Anderson*, 57 Mont. 223, 187 Pac. 908), yet it is elementary that ''Competent evidence must be produced of all facts necessary to a recovery, upon which the jury can base a reasonable reliable conclusion; nothing can be left to mere

conjecture." (*Watson* v. *Colusa-Parrot Co.*, 31 Mont. 513, 79 Pac. 14; *Raas* v. *Sharp,* 46 Mont. 474, 128 Pac. 594.)

Plaintiffs allege that the cattle were driven and left "in [3] a hungry condition on portion of the land belonging to the plaintiff Flynn, adjacent to the field where the grain was shocked"; but the answer denies this specifically and admits only, by affirmative allegation, that they were by defendants driven down the county road "a distance of some ten miles and left * * * near the premises of the * * * plaintiff Flynn," and nothing further is established by plaintiffs' proof. There is a failure of proof as to how the cattle got into plaintiff Flynn's pasture, and later into the grain-field. This is left entirely in the realm of speculation. There is a complete failure of proof in support of the material allegations of plaintiffs' complaint in the following particulars: That the cattle were driven by the defendants, without food or pasture; that the fence inclosing the pasture of the plaintiff Flynn was torn down by the defendants; and that the cattle were driven by the defendants upon the plaintiff Flynn's land adjacent to the field where the grain was shocked. There is nothing in the evidence to show where the cattle were from Sunday afternoon until Monday evening, nor how they got into the grain-field on Wednesday night. The cattle were last seen down the road at least two miles from the plaintiff Flynn's premises on Monday, and the oat-field was not trespassed upon by them until Wednesday. Evidence is wholly lacking as to how the cattle got into Flynn's pasture on Monday night, although it is clear that, after they were in such pasture, they broke into the inclosed grain-field within the pasture, on Wednesday. It will be noticed that the action is based entirely upon the trespass of these cattle upon plaintiff's land, occasioned through the tortious acts of the defendants, and no complaint is made on account of moving them from their accustomed range or for rough handling.

The burden of proof rested upon the plaintiffs in this [4, 5] case to prove that the moving of the cattle by the defendants was the proximate cause of the injury and damage complained of, and, failing so to do, a nonsuit was properly granted. There must be a causal connection between the negligence alleged and the injury. (*Bracey* v. *Northwestern Impl. Co.*, 41 Mont. 338, 137 Am. St. Rep. 738, 109 Pac. 706; Thompson on Negligence, sec. 45.)

"The proximate cause of an injury is that which in a natural and continuous sequence, unbroken by any new, independent cause, produces an injury, and without which the injury would not have occurred." (*Mize* v. *Rocky Mt. Bell Tel. Co.*, 38 Mont. 521, 129 Am. St. Rep. 659, 16 Ann. Cas. 1189, 100 Pac. 971.)

"It is not every negligent act that gives a cause of action; it is only such neglect of duty as bears a direct proximate, and causal relation to the injury." (*Monson* v. *La France Copper Co.*, 39 Mont. 50, 133 Am. St. Rep. 549, 101 Pac. 243; *Andree* v. *Anaconda Co.*, 47 Mont. 554, 133 Pac. 1090; *Wallace* v. *Chicago etc. Ry. Co.*, 48 Mont. 427, 138 Pac. 499). And negligence must be shown—it will not be presumed (*Reino* v. *Montana Mineral Land Co.*, 38 Mont. 291, 99 Pac. 853; 1 Thompson on Negligence, sec. 45).

"To constitute actionable negligence, there must be not only causal connection between the negligence complained of and the injury suffered, but the connection must be by a natural and unbroken sequence—without intervening efficient cause—so that, but for the negligence of the defendant, the injury would not have occurred." (22 R. C. L. 113.)

If the injurious act is wanton, the doer of it is liable for all consequences; but there is no essential difference between the measure of liability for willful and negligent torts. In both instances the injury complained of must be a natural and direct result. (22 R. C. L. 123.)

In our opinion, the evidence does not disclose any causal connection between the driving of the cattle by the defend-

ants and the destruction of plaintiffs' grain, and the nonsuit was therefore properly granted. The judgment is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES COOPER and HOLLOWAY and HONORABLE ROY E. AYERS, District Judge, sitting in place of MR. JUSTICE REYNOLDS, disqualified, concur.

MR. CHIEF JUSTICE BRANTLY, being absent, takes no part in the foregoing decision.